UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

FSL ACQUISITION CORP., a Minnesota
corporation, and KARDIA HEALTH
SYSTEMS, INC., a Minnesota corporation,

               Plaintiffs,

v.

FREELAND SYSTEMS, LLC, a Florida
limited-liability company, JOHN
FREELAND, and ALAN STEGEMOLLER,

               Defendants.

FREELAND SYSTEMS, LLC, a Florida
limited-liability company,

               Counterclaimant,

v.

FSL ACQUISITION CORP., a Minnesota
corporation, KARDIA HEALTH SYSTEMS,
INC., a Minnesota corporation, and GUS
CHAFOULIAS,

               Counter-defendants.

Case No. 09-CV-2767 (PJS/AJB)

ORDER

---

Barbara Podlucky Berens, Paul R. Hannah, Erin K. Fogarty Lisle, and Catherine A.
McEnroe, KELLY & BERENS, P.A.; Thomas B. Heffelfinger, BEST & FLANAGAN,
LLP, for plaintiffs/counter-defendants.

Sara A. Poulos and Peter N. Surdo, ROBINS, KAPLAN, MILLER & CIRESI, L.L.P., for
defendants and counterclaimant.

Plaintiffs FSL Acquisition Corp. and Kardia Health Systems (collectively "Kardia")

move for a preliminary injunction forbidding defendants Freeland Systems, LLC and John

Freeland (collectively "Freeland") from foreclosing on and selling certain assets in which

Freeland claims to have a security interest.  Freeland opposes the motion and asks the Court, if it

grants the motion, to require Kardia to post a $6 million bond.

The Court heard argument on Kardia's motion on February 2, 2010.  For the reasons that

follow, as well as for the reasons provided by the Court at the hearing, the Court grants the

motion with respect to certain assets that came into existence after May 8, 2008 and denies the

motion in all other respects.[1]  The Court declines to order Kardia to post a bond.

## I.  BACKGROUND

The Court briefly summarizes the relevant, undisputed facts.  Kardia provides software to

health-care providers for managing medical images.  Up until May 2008, so did Freeland.  In

November 2007, Kardia and Freeland executed a license agreement that granted Kardia the right

to use certain intellectual property belonging to Freeland.  Freeland Decl. ¶ 14 [Docket No. 75].

On May 8, 2008, Kardia (acting through FSL Acquisition Corp.) and Freeland executed an

"Asset Purchase Agreement" under which Kardia acquired all of Freeland's assets and

employees.[2]

---

[1]The motion to dismiss of defendants John Freeland and Alan Stegemoller (and former
defendant Maryanne Carroll) was also scheduled to be argued at the February 2, 2010 hearing.
*See* Mot. Dism. [Docket No. 3], Am. Not. Hr'g [Docket No. 56].  Defendants did not mention
their motion at the hearing, however, and the complaint to which it was directed has been
superseded.  *See* Second Am. Suppl. Compl. [Docket No. 46].  Defendants themselves recognize
that their motion is largely moot.  Def. Reply Mem. at 1 [Docket No. 55].  The Court therefore
denies the motion without prejudice.

[2]The Asset Purchase Agreement and the associated Bill of Sale (exhibit D to the Asset
Purchase Agreement) are found in two places in the record.  Ans. Second Suppl. Am. Compl &
Counterclaims Ex. C (Asset Purchase Agreement and all exhibits, including Bill of Sale) [Docket
No. 66]; Berens Aff. Ex. 1 (Asset Purchase Agreement), Ex. 3 (Bill of Sale) [Docket No. 73].
The Court cites the Asset Purchase Agreement as "APA" and the Bill of Sale as "APA Ex. D."

Kardia agreed to buy Freeland for a total of $10 million, to be paid in three installments. Kardia paid the first installment, of roughly $4 million, when the transaction closed on May 8, 2008. Also as part of the closing, Kardia executed a promissory note under which it promised to pay a total of $5.8 million in two further installments — $3 million by May 8, 2009, and another $2.8 million by May 8, 2010. Berens Aff. Ex. 2 [Docket No. 73]. To secure this promissory note, Kardia granted Freeland a security interest in certain collateral. APA ¶ 2.2(a)-(b).

In May 2009, Kardia failed to make the first payment due under the promissory note. Freeland Decl. ¶ 47. Over the next few months, Kardia and Freeland negotiated two extensions of the due date. *Id.* ¶¶ 48-53. Kardia then sought, but was denied, a third extension. Instead of paying Freeland the $3 million that originally had been due in May, Kardia filed this lawsuit in September 2009, contending that Freeland committed fraud in connection with the 2008 sale.

Freeland notified Kardia in mid-November 2009 that it intended to foreclose on and sell certain assets of Kardia's in which Freeland claimed to have a security interest under the Asset Purchase Agreement. Berens Aff. Ex. 4. (Freeland apparently intended to purchase these assets itself and to reenter the medical-imaging-software business in competition with Kardia.) After an in-chambers conference with the parties, the Court ordered Freeland to identify more specifically the items it proposed to foreclose on and sell, to explain both why those items qualified as collateral under the Asset Purchase Agreement and how Freeland came to possess those items, and to identify witnesses with relevant knowledge about those items. Order Nov. 17, 2009 [Docket No. 33]. The Court also permitted the parties to conduct limited discovery about Freeland's proposed sale. Order Dec. 2, 2009 [Docket No. 39]. The Court denied

Freeland's motion for an order requiring Kardia to post a bond during the postponement of the proposed sale.  Order Dec. 22, 2009 [Docket No. 63].

As ordered by the Court, Freeland provided Kardia a list of the collateral that it proposes to sell.  Berens Aff. Ex. 5.  Kardia moves for a preliminary injunction forbidding the sale.

## II.  STANDARD OF REVIEW

A court must consider four factors in deciding whether to grant a preliminary injunction: (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between this harm and the injury that granting the injunction will inflict on the other litigants; and (4) the public interest.  *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).  A preliminary injunction is an extraordinary remedy, and the party seeking the injunction bears the burden of establishing the four *Dataphase* factors.  *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

To the extent that Kardia contends that the Court should place the burden on Freeland to establish the validity of Freeland's security interest, Kardia is mistaken.  It is true that, in certain contexts (such as in bankruptcy proceedings), a secured creditor such as Freeland must establish the existence of its security interest.  *See, e.g.*, *In re Immerfall*, 216 B.R. 269, 272 (Bankr. D. Minn. 1998) (explaining that Fed. R. Bankr. P. 3001(c) "imposes the procedural burden of producing documentary proof of secured status on any creditor that asserts such"); *In re Kamps*, 217 B.R. 836, 851 (Bankr. C.D. Cal. 1998) ("The bank has the burden of showing that it has a valid security interest in the goods here at issue.").  But in this case, it is Kardia that seeks affirmative relief in the form of an injunction, and it is therefore Kardia's burden to establish that it is entitled to this relief.

### III.  DISCUSSION

#### A.  Fraudulent Inducement

According to Kardia, Freeland fraudulently induced Kardia to enter into the Asset Purchase Agreement, which is therefore not binding on Kardia.  Pl. Mem. Supp. Mot. at 7-10 [Docket No. 69].  Because Freeland's claimed security interest is created by the Asset Purchase Agreement, if that agreement is not binding because of Freeland's fraud, then Freeland's claimed security interest is invalid.  *See Crystal Springs Trout Co. v. First State Bank of Froid*, 732 P.2d 819, 827 (Mont. 1987).

For many reasons, the Court finds it highly unlikely that Kardia will succeed on the merits of its claim for fraudulent inducement.  Kardia is therefore highly unlikely to succeed, through its fraud claim, in invalidating the entirety of Freeland's claimed security interest.

The Court discussed the weaknesses of Kardia's fraud claim at length during the February 2, 2010 hearing.  For purposes of this order, the Court will highlight only two of the most serious problems with that claim.  First, Kardia acquired Freeland, including all of Freeland's software and its key employees, in May 2008.  But Kardia did not seriously contend until September 2009  — 16 months later — that Freeland lied about the capabilities of the software.  And Kardia made this accusation only after it found itself without the funds to make a substantial payment due to Freeland under the Asset Purchase Agreement — and only after Kardia successfully sought two extensions of the due date for that payment and unsuccessfully sought a third.

Any juror will find this timing questionable and will wonder why, if the Freeland software was as defective as Kardia now contends, it took Kardia 16 months to figure this out

and to take action.  The jury will also wonder why, over a year after buying the supposedly

defective software, Kardia repeatedly begged (and paid) Freeland to grant it more time to pay for

that very software.  Kardia's response seems to be that former Freeland employees concealed

software defects from Kardia by, among other things, not giving certain Kardia employees access

to the Freeland source code.  Pl. Reply Mem. at 4-5 [Docket No. 79].  But after May 2008,

Kardia *owned* that source code, and those former Freeland employees worked for *Kardia*.

Kardia's argument is thus that it did not discover Freeland's purported fraud for almost a year

and a half because some of Kardia's own employees refused to give information to other Kardia

employees about source code owned by Kardia.  The Court does not have much sympathy for

this argument, and neither (in the Court's estimation) will a jury.

     Further, Kardia will have to persuade the jury to ignore contract language that is expressly

directed at foreclosing the type of fraud claim Kardia now brings.  Kardia is correct that, as a

legal matter, contractual disclaimers of reliance are sometimes not given effect under Minnesota

law.  *See Ganley Bros., Inc. v. Butler Bros. Bldg. Co.*, 212 N.W. 602, 603 (Minn. 1927) ("The

law should not and does not permit a covenant of immunity to be drawn that will protect a person

against his own fraud."); *see also Randall v. Lady of Am. Franchise Corp.*, 532 F. Supp. 2d 1071,

1082-85 (D. Minn. 2007) (discussing Minnesota law about fraud and parol evidence in contract

cases).  Whether the contractual disclaimers in this case should be given effect despite Kardia's

fraud allegations remains an open question.

     Even if those contractual disclaimers do not foreclose Kardia's fraud claims as a matter of

law, however, the disclaimers are nevertheless evidence of whether Freeland committed fraud.

Thus, the jury will learn that Kardia asserted, in ¶ 4.4 of the Asset Purchase Agreement, that:

> [Kardia] is a sophisticated purchaser and has made its own investigation, review and analysis regarding the Business, the Purchased Assets, the Assumed Liabilities and the transactions contemplated hereby, which investigation, review and analysis were conducted by [Kardia].  [Kardia] has been provided with full and complete access to the properties, offices, and other facilities of [Freeland Systems], books and records of [Freeland Systems] relating to the Business and other information that they have requested in connection with their investigation of the Business, the Purchased Assets, the Assumed Liabilities and the transactions contemplated hereby.

APA ¶ 4.4.  If the jury believes these assertions, it will naturally be skeptical of Kardia's fraud claims.  But if Kardia persuades the jury that some of these assertions are false — for instance, if Kardia persuades the jury that Freeland did *not* give Kardia "full and complete access" to Freeland's information before May 2008 — then Kardia will have to explain why it signed an agreement that contained misrepresentations not just about Freeland, but also about *Kardia.*  This contract language makes Kardia's already-tenuous fraud case appear even more tenuous.

## B.  Description of Collateral

Kardia also challenges Freeland's security interest on the basis of the way the collateral is described in the Asset Purchase Agreement and the associated Bill of Sale.  First, Kardia contends that Freeland's security interest is invalid in its entirety because the collateral is not sufficiently described.  Pl. Mem. Supp. Mot. at 11-20.  The Court finds that Kardia is unlikely to prevail on this argument.  Second, Kardia contends that even if Freeland's security interest is generally valid, it does not extend to software and customer lists that postdate May 2008 and that

(according to Kardia) are not covered by the language describing the collateral.[3] *Id.* at 20-28. The Court finds that Kardia *is* likely to prevail on this second argument.

The Minnesota law governing secured transactions is revised Article 9 of the Uniform Commercial Code, which became effective in Minnesota as of July 1, 2001 and is codified in chapter 336 of the Minnesota Statutes. Act of April 14, 2000, 2000 Minn. Laws ch. 399 (S.F. No. 1495), art. 1, § 130; *see also Allete, Inc. v. GEC Eng'g, Inc.,* 726 N.W.2d 520, 521 n.2 (Minn. Ct. App. 2007). As relevant to this case, Minn. Stat. § 336.9-203(b) provides that a security interest is enforceable only if "the debtor has authenticated a security agreement that provides a description of the collateral . . . ." Minn. Stat. § 336.9-203(b)(3)(A).[4] Section 108 of the Minnesota Statutes, titled "Sufficiency of Description," governs whether a security

_____

[3]Freeland also proposes to foreclose on and sell the following:

- versions of logos and artwork that postdate May 2008 and relate to the names "AccessPoint" and "Data Miner";

- certain "Business Documents and Operating Procedures," including documents that postdate May 2008; and

- certain internet addresses.

*See* Berens Aff. Ex. 5 (table items 2, 4, and 5).

Apart from arguing that Freeland's security interest is entirely invalid — an argument that the Court rejects — Kardia has not provided any argument about why Freeland's security interest in these particular items is invalid. *See* Pl. Mem. Supp. Mot. at 20-28. Kardia has therefore failed to meet its burden to show that the Court should enjoin Freeland from foreclosing on and selling these items.

[4]When a secured party possesses certain types of collateral in accordance with a security agreement, the collateral need not be described. *See* Minn. Stat. § 336.9-203(b)(3)(B)-(D). The parties agree that the collateral in this case is subject to the description requirement of § 336.9-203(b)(3)(A).

agreement's description of collateral is sufficiently precise to support a security interest in that collateral.

As a general rule, "a description [in a security agreement] of personal or real property is sufficient, whether or not it is specific, if it reasonably identifies what is described."  Minn. Stat. § 336-9.108(a).  As the quoted language makes clear, the collateral-description requirement under Minnesota's version of the UCC is not demanding:  A description that "reasonably identifies" the collateral is sufficient even if the description is not "specific."

Minnesota law does, however, place an outer limit on the level of generality with which collateral may be described in a security agreement.  Section 336-9.108(c) of the Minnesota Statutes — titled "Supergeneric description not sufficient" — provides that "[a] description of collateral as 'all the debtor's assets' or 'all the debtor's personal property' or using words of similar import does not reasonably identify the collateral."  Minn. Stat. § 336-9.108(c).

Acceptable methods of describing collateral include identification by: "(1) specific listing; (2) category; (3) . . . a type of collateral defined in the Uniform Commercial Code; (4) quantity; [and] (5) computational or allocational formula or procedure . . . ."  Minn. Stat. § 336-9.108(b).  Indeed, as long as collateral is not identified by a forbidden "supergeneric" description, collateral may be described by "*any other method*, if the identity of the collateral is objectively determinable."  Minn. Stat. § 336-9.108(b)(6) (emphasis added); *see also James Talcott, Inc. v. Franklin Nat'l Bank of Minneapolis*, 194 N.W.2d 775, 782 (Minn. 1972) (holding, under the pre-revision version of Article 9, that "[a] security agreement should not be held unenforceable unless it is so ambiguous that its meaning cannot reasonably be construed from the language of the agreement itself").

-9-

The collateral description in this case is made up of two provisions, one found in the parties' Asset Purchase Agreement, and a second found in the parties' Bill of Sale and cross-referenced in the Asset Purchase Agreement.  Paragraph 2.2(b) of the Asset Purchase Agreement, titled "Description of Collateral," provides in full:

> The collateral subject to this security interest (herein referred to as "Collateral") is (i) all Purchased Assets identified on the Bill of Sale, (ii) all renewals, substitutions, replacements, accessions, proceeds, and products of the Purchased Assets, and (iii) the Buyer's present and future rights to payment of monetary obligations from the Business, whether or not earned by performance, for property or services that has been or is to be sold, leased, licensed, or otherwise disposed of by Buyer, for services rendered [or] to be rendered by Buyer, including but not limited to accounts receivable relating to the Business.  Notwithstanding the foregoing, "Collateral" shall not include the Employee Benefit Plans.

APA ¶ 2.2(b).  The dispute now before the Court centers around items (i) and (ii) in this list.  Specifically, the parties disagree over whether the "Purchased Assets identified on the Bill of Sale" were adequately described and, if they were, whether certain things on which Freeland Systems wishes to foreclose qualify as "renewals, substitutions, replacements, accessions, proceeds, and products of the Purchased Assets . . . ."

Paragraph 1 of the Bill of Sale defines the "Purchased Assets" as "certain specified tangible and intangible assets . . . as they exist at the time of Closing . . . ."  APA Ex. D ¶ 1.  The Bill of Sale then describes the specified assets at length in ¶¶ 1.a-1.s.  For purposes of this motion, the most important of those paragraphs are ¶ 1.b, which relates to customer information, and ¶ 1.k, which relates to intellectual property in general and to computer software in particular.

Paragraph 1.b of the Bill of Sale defines Purchased Assets to include:

> All employee and customer lists, and customer credit information;
> [e]mployee lists-provided; [c]ustomer lists-provided; [c]ustomer
> credit information-the Company does not do credit checks.
> Customer list includes both active and inactive customers as well
> as potential customers for which a quote has been prepared or
> business discussions are in progress.  Customer lists are
> documented in QuickBooks and telemarketing documentation.
> *DVD copies supplied at closing.*

APA Ex. D ¶ 1.b (emphasis added).

Paragraph 1.k of the Bill of Sale defines Purchased Assets to include:

> All Intellectual Property, including all technology, ideas,
> inventions, designs, proprietary information, manufacturing and
> operating specifications, know-how, formulae, technical data,
> computer programs (in source code and object code), hardware,
> software and processes, including without limitation all software,
> software development rights and copyrights, whether completed or
> under development, together with other such intangible assets,
> properties and rights (whether or not appropriate steps have been
> taken to protect, under applicable law, such other intangible assets,
> properties or rights); *DVD copies supplied after closing.*

APA Ex. D. ¶ 1.k (emphasis added).

These two paragraphs conclude with the phrase, "DVD copies supplied after [or at]

closing."  Analogous language is included in ¶ 1.a, which relates to physical assets, and ¶ 1.j,

which relates to trade secrets.[5]  Kardia contends that Freeland neglected to supply Kardia with the

---

[5]Paragraph 1.a defines Purchased Assets to include:

> All interests in machinery, equipment, copiers, computers,
> furniture, fixtures, supplies, other tangible personal property and
> fixed assets and all proprietary rights relating thereto, including all
> computer systems, software, hardware and related documentation;
> *[e]xact inventory will be furnished within two weeks of closing.*

APA Ex. D ¶ 1.a (emphasis added).

Paragraph 1.j defines Purchased Assets to include:

DVDs called for in the Bill of Sale and that, without those DVDs, Freeland's security interest in the collateral failed to attach because the collateral was insufficiently described.  Pl. Mem. Supp. Mot. at 13-18.  For its part, Freeland disputes both Kardia's factual premise and its legal conclusion.  According to Freeland, it did supply the requisite DVDs to Kardia, and even if it did not, the Bill of Sale adequately describes the collateral.  Def. Opp. Pl. Mot. at 20-24 [Docket No. 74].  The Court need not resolve the parties' factual dispute because the Court finds that even if Freeland failed to supply the DVDs, Kardia is unlikely to prevail on its argument that the Bill of Sale fails to adequately describe the collateral under Minnesota law.

The collateral descriptions challenged by Kardia are not the type of supergeneric descriptions forbidden under Minn. Stat. § 336.9-108(c).  The only question, then, is whether, under the challenged descriptions, "the identity of the collateral is objectively  determinable." Minn. Stat. § 336.98-108(b)(6).  If the collateral descriptions in ¶¶ 1.b and 1.k of the Bill of Sale had simply omitted the words "DVD copies supplied at closing," Kardia would have a very difficult time arguing that those descriptions are so vague that the collateral they cover is not objectively identifiable.  Paragraph 1.b covers, for instance, "employee and customer lists" as those lists exist at the time of closing.  APA Ex. D ¶¶ 1.b. & 1.  There is nothing unclear about this description.  Similarly, ¶ 1.k covers, among other things, "all software, software

---

All trade secrets including, but not limited to, all information regarding customers and customers' requirements, all research, market studies, surveys, reports, knowhow and confidential information used or held for use exclusively in the Business; *[c]ustomer list supplied at closing.*

APA Ex. D ¶ 1.j (emphasis added).

development rights and copyrights, whether completed or under development" as those things exist at the time of closing.  APA Ex. D ¶¶ 1.k. & 1.  Again, there is nothing unclear about this description.

To support its argument that Freeland's failure to provide the DVDs promised in the Bill of Sale vitiates Freeland's security interest in things like customer lists and software, Kardia cites a variety of cases in which courts found that collateral was inadequately described when a security agreement described collateral with reference to a nonexistent attachment.  For instance, *In re Southern Illinois Railcar Co.* held that a security agreement purporting to create a security interest in "'Equipment as more fully described on Schedule A'" did not adequately describe the collateral because "no Schedule A [was] attached to the Loan and Security Agreement."  301 B.R. 305, 310 (Bankr.  S.D. Ill.  2002).

In this case, however, the Bill of Sale itself describes — and at some length — the collateral in which Freeland has a security interest under the Asset Purchase Agreement.  After the Bill of Sale describes collateral, the Bill of Sale then provides that Freeland will supply DVDs at or after closing.  But the Bill of Sale in no way identifies the collateral with reference to the DVDs; specifically, nothing in the Bill of Sale suggests that the collateral is limited to the contents of the DVDs.  As a result, this case is much different from the cases on which Kardia relies.

Had the parties wished to limit the collateral to whatever was found on a DVD or described in an inventory, they could have done so quite easily by, for instance, describing the software under ¶ 1.k as "the software found on DVDs to be supplied at closing."  But the parties did not use such limiting language.  Instead, the parties agreed to language that reasonably

identifies the collateral, and they further agreed that Freeland would undertake to supply Kardia

with DVDs (or other inventories).  If Freeland had completed this undertaking, interested parties

and the Court might find it easier to identify the collateral in which Freeland took a security

interest under the Asset Purchase Agreement.  But Minnesota law does not require that a security

agreement describe collateral as accurately as possible.  Rather, collateral must be described so

that it is objectively identifiable, and collateral must not be described with supergeneric terms.

Minn. Stat. § 336.9-108(b)-(c).  The Asset Purchase Agreement and the Bill of Sale meet these

requirements.

      Further, to the extent that Kardia contends that collateral such as software must be

described especially carefully — particularly when that software is acquired by a company that

continues to develop it — the Court disagrees.  There is no warrant in any Minnesota case or

statute for imposing such a heightened requirement on software or similar collateral, and the

cases cited by Kardia from other jurisdictions do not persuade the Court that Minnesota courts

would impose heightened standards of the kind that Kardia seems to advocate.

      Accordingly, with respect to collateral that existed at the time of closing and that is

described in the Bill of Sale, the Court finds that Kardia is unlikely to prevail on its argument

that because the collateral is inadequately described, Freeland's security interest in that collateral

is invalid.

      Kardia has a stronger argument, however, with respect to collateral that came into

existence after the closing in May 2008.  The Bill of Sale, by its terms, covers only "certain

specified tangible and intangible assets . . . *as they exist[ed] at the time of Closing* . . . ."  APA

Ex. D ¶ 1 (emphasis added).  Kardia therefore contends that whatever security interest Freeland

may have in Kardia's software and customer information, that security interest does not extend to software or customer information that Kardia developed or acquired after the closing. The Court finds that Kardia is likely to prevail on this argument.[6]

Freeland contends that it has a security interest in post-closing software and customer lists by virtue of ¶ 2.2(b)(ii) of the Asset Purchase Agreement, which grants Freeland a security interest not just in "Purchased Assets" as described in the Bill of Sale, but also in "all renewals, substitutions, replacements, accessions, proceeds, and products of the Purchased Assets . . . ." APA ¶ 2.2(b)(ii). This language plainly gives Freeland a security interest in *some* things that postdate the closing. But, in the Court's estimation, this language does not appear — on the current record — to give Freeland a security interest in software or customer information that came into existence after the closing.

Neither Freeland nor Kardia has taken a clear position on what qualifies as a substitution, replacement, or product of the Purchased Assets under ¶ 2.2(b)(ii) of the Asset Purchase Agreement. (Freeland does not contend that the assets in dispute are either "accessions" or "proceeds" of the Purchased Assets.) For its part, Freeland says that customers developed after the closing qualify as "products" of the Purchased Assets because, without the software purchased by Kardia from Freeland, those customers would not exist. Def. Opp. Pl. Mot. at 37 ("[T]he development of AccessPoint customers is a product of the Purchased Assets . . . ."). This

---

[6]The Court reaches this conclusion even while rejecting Kardia's assertion that the Court should construe the description of the collateral in the Asset Purchase Agreement against Freeland. For one thing, as a factual matter, it is not clear to the Court that Freeland drafted the collateral description. Further, the Asset Purchase Agreement says that "[n]o provision of this Agreement or any related document shall be construed against or interpreted to the disadvantage of any party hereto . . . ." APA ¶ 10.4. The Court sees no reason to disregard this provision.

argument cannot be taken seriously.  Milk is the product of a cow; widgets are the product of widget factories.  *See, e.g.*, *Prod. Credit Ass'n W. Cent. Minn. v. Bartos*, 430 N.W.2d 238, 239 (Minn. Ct. App. 1988) (quoting a security agreement covering, among other things, "[t]he following products of live-stock and poultry: [m]ilk").  A customer is not the product of software he uses, any more than a milk drinker is the product of the cow whose milk he drinks, or than a widget buyer is the product of a widget factory.

Freeland also contends that software developed by Kardia since May 2008 that relates to Freeland's AccessPoint software as it existed in May 2008 is either a "substitution" for or a "replacement" of the May 2008 AccessPoint software.  Def. Opp. Pl. Mot. at 33.  And Freeland contends that updated customer lists created by Kardia are replacements of the lists that existed in May 2008.  *Id.* at 37.  But neither Freeland nor Kardia points to any language in the Asset Purchase Agreement or the Bill of Sale that would explain what the parties meant by the terms "replacement" and "substitution."

With respect to physical assets, "replacements" and "substitutions" are fairly easy to identify.  But the Court is less certain how these words apply in connection with software or customer lists.  When you replace the engine in a truck, the new engine literally *takes the place of* the old engine.  But when you update software or customer lists, the old software and lists may be *superseded*, but they are not exactly *displaced*.  Generally, you can still use old customer lists and software — many thousands of computers still run Windows 95 — even though you can no longer use a truck engine that has been replaced to power the truck from which that engine was taken.

-16-

Kardia and Freeland seem to agree that Kardia improved certain aspects of the AccessPoint software by fixing bugs in the software that it acquired from Freeland in May 2008, that Kardia improved other aspects of Freeland's software by writing new code that added entirely new functionality, and that Kardia improved still other aspects of Freeland's software by replacing Freeland's code for certain functionality with Kardia-written code for the same functionality.  On the one hand, if Kardia wrote new code to provide new functionality, that code would not "replace" or "substitute" for earlier code that lacked the new functionality.  On the other hand, if Kardia incorporated such new code into an upgraded version of the AccessPoint software — version 2.1, say, which superseded version 2.0 — then one might argue that at the level of the software suite (though not at the level of an individual piece of code within the suite), Kardia's version of AccessPoint "replaced" or "substituted for" the May 2008 version of that code that Freeland sold to Kardia.

In short, the Court finds that the terms "replacements" and "substitutions" in ¶ 2.2(b) of the Asset Purchase Agreement are ambiguous as applied to software.  And because those terms are ambiguous, extrinsic evidence is admissible to clarify their meaning.  *See Transp. Indem. Co. v. Dahlen Transp., Inc.*, 161 N.W.2d 546, 550 (Minn. 1968); *see also Minn. Sch. Bds. Ass'n Ins. Trust v. Employers Ins. of Wausau*, 331 F.3d 579, 582 (8th Cir. 2003) (citing *Transp. Indem. Co.*).  The extrinsic evidence submitted to the Court strongly suggests that the parties did *not* agree that Freeland would have a security interest in all software developed or improved by Kardia after May 2008.

Most significantly, John Freeland forwarded a draft Asset Purchase Agreement to Kardia in April 2008 that plainly granted Freeland a security interest in the types of software upgrades

that are now in dispute.  That draft agreement, in proposed ¶ 2.2(b)(iii), defined the collateral to

include:

> any present and future 'general intangibles' (as defined by the
> Colorado Uniform Commercial Code), including, without
> limitation, all intellectual property, payment intangibles, royalties,
> contract rights, goodwill, insurance policies, and rights to payment
> of any kind, and *specifically including new releases,*
> *improvements, modifications, updates, upgrades, fixes, and*
> *additions to the Purchased Assets* . . . .

Danko Suppl. Aff. Ex. 3 at 6 [Docket No. 80] (draft agreement attached to April 8, 2008 email

from John Freeland to George Danko) (emphasis added).  Further, in proposed ¶ 2.2(b)(ii), the

draft agreement defined collateral to include "additions" to the Purchased Assets, along with the

renewals, substitutions, replacements, accessions, proceeds, and products that were covered in

the final Asset Purchase Agreement.  *Id.*  The word "additions" in ¶ 2.2(b)(ii) of the draft

agreement was stricken in the final agreement, as was the entire proposed ¶ 2.2(b)(iii) covering

general intangibles and improvements to software.  *See* McEnroe Aff. Ex. 1 [Docket No. 81].

This drafting history shows that the parties were quite capable of drafting — in fact, *did*

draft — an agreement that would have given Freeland a security interest in the types of software

developments now at issue.  Perhaps the parties concluded that the precise language about

software in the April 2008 draft agreement was unnecessary because "substitutions" and

"replacements" already covered the waterfront.  This seems implausible, though.  By far, the

most important asset being sold by Freeland to Kardia was software — and thus the single most

important question regarding collateral would have been Freeland's ability to foreclose on not

just the software that it sold in May 2008 (which would quickly become outdated), but the

software as it was modified by Kardia.  A jury is unlikely to believe that Freeland negotiated a

-18-

security interest in this extremely valuable asset, and then turned around and agreed to delete language that described Freeland's security interest in crystal-clear terms, in favor of murky language whose application to the asset was uncertain.

It must also be recalled that the word "additions" appeared in the draft agreement alongside "substitutions" and "replacements" and was deleted in the final agreement. An "addition" is not a "substitution" or a "replacement," and thus, when the parties deleted "additions," they were substantially narrowing the scope of Freeland's security interest. Moreover, the word "additions" would seem to cover much of the software developments now in dispute. For all of these reasons, the drafting history strongly suggests that Kardia refused to grant Freeland a security interest in the very things that Freeland now contends are covered by the security agreement — software that was developed or improved by Kardia after May 2008.

Accordingly, the Court finds that Kardia is likely to prevail on its argument that Freeland's security interest in the AccessPoint software does not extend to software developed by Kardia after May 2008. Kardia is also likely to prevail on its argument that Freeland's security interest in customer lists does not extend to customer lists that postdate May 2008. With respect to the balance of harms and the public interest, the Court finds that these factors do not weigh strongly either for or against an injunction. As a result, Kardia's likelihood of succeeding in challenging Freeland's asserted security interest in post-closing software and customer lists tips the balance in favor of granting Kardia's motion with respect to those assets.

### C.  Request for Bond

Freeland asks the Court to require Kardia to post a $6 million bond if the Court grants Kardia's motion for a preliminary injunction.  Def. Opp. Pl. Mot. at 42-43.  Under Fed. R. Civ. P. 65(c), if the Court issues a preliminary injunction, the Court must order the movant to "give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).

Freeland has not established any amount that would be "proper" to pay its costs and damages if it turns out that the Court has wrongfully enjoined Freeland from selling purported collateral that came into existence after May 2008.  The purpose of that purported collateral is to secure Kardia's debt to Freeland under the Asset Purchase Agreement and the associated promissory note.  If, as the Court thinks likely, Freeland is found not to have a security interest in the purported collateral, then Freeland will have nothing to complain about (as the injunction will not be "wrongful[]").  If Kardia is found to owe no debt to Freeland, then Freeland will also have nothing to complain about.  And if Kardia is found to owe a debt to Freeland, then Freeland will recover a judgment that, at least in theory, will make it whole.  Again, Freeland will have nothing to complain about.  Freeland will have something to complain about — that is, Freeland will be harmed by a wrongful injunction — only if (1) the software and customer lists created after May 2008 are found to be collateral; (2) Kardia is found to owe a debt to Freeland; (3) Kardia is unable to pay the judgment entered against it; and (4) Freeland could collect some of that future deficiency now if it were permitted to sell the software and customer lists created after May 2008.  Given the highly speculative nature of Freeland's projected damages from a wrongful injunction, the Court finds that the proper amount of a bond in this case is zero.

-20-

ORDER

Based on the foregoing and on all of the files, records, and proceedings herein, IT IS

HEREBY ORDERED THAT:

1.      The motion of plaintiffs FSL Acquisition Corp. and Kardia Health Systems, Inc,

        for a preliminary injunction [Docket No. 67] is GRANTED IN PART and

        DENIED IN PART as follows:

        a.      Defendants Freeland Sytems, LLC and John Freeland are hereby

                ENJOINED from foreclosing on the following assets identified in the table

                provided by them to plaintiffs on November 24, 2009 (attached as

                Exhibit 5 to the Berens Affidavit [Docket No. 73]):

                i.       the file "KF QB Customer list.xls" identified as item 1.b of the

                         table;

                ii.      the file "SQL Customers - Nanci.xlsx" identified as item 1.g of the

                         table;

                iii.     the file "QMI customer list" identified as item 1.h of the table; and

                iv.      the "AccessPoint source code, object code and supporting

                         documentation for the full AccessPoint suite of products"

                         identified as items 3.a to 3.x of the table and found on DVDs

                         produced by Freeland Systems in discovery as items

                         FREE0000001 and FREE0000002.

        b.      The motion is DENIED in all other respects.  Specifically:

i.      The motion is DENIED with respect to items, including software, that are defined as Purchased Assets under the May 8, 2008 Asset Purchase Agreement and that were in existence as of May 8, 2008.

ii.     The motion is DENIED with respect to the software found on backup DVDs made on or about May 12, 2008 and produced by Freeland Systems in discovery and marked as items FREE0000003 and FREE0000004.

iii.    The motion is DENIED with respect to items identified under items 2, 4, and 5 of the table.

2.     The motion to dismiss of defendants John Freeland and Alan Stegemoller [Docket No. 3] is DENIED WITHOUT PREJUDICE.

Dated: February 12, 2010            s/Patrick J. Schiltz
                                      Patrick J. Schiltz
                                      United States District Judge